IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ADRIENNE WALKER-PITTMAN | * |
| | * |
| v. | * |
| | *    Civil No. CCB-14-202 |
| MARYLAND DEPARTMENT OF | * |
| TRANSPORTATION, | * |
| MARYLAND TRANSIT | * |
| ADMINISTRATION | * |

******

## MEMORANDUM

Plaintiff Adrienne Walker-Pittman brings suit for employment discrimination against her former employers, the Maryland Department of Transportation ("MDOT") and the Maryland Transit Administration ("MTA"), a unit within the MDOT (collectively "defendants"). On October 1, 2009, state budget cuts abolished Walker-Pittman's position with the MTA. On January 27, 2014, Walker-Pittman filed this suit. (Complaint, ECF No. 1). Her original complaint contained eleven causes of action alleging violations of various state and federal civil rights laws relating to her termination and prior employment with defendants. *Id.* Defendants filed a motion to dismiss or, in the alternative, for summary judgment. (ECF No. 5). Walker-Pittman filed a response in opposition, in which she conceded that several of her claims were barred by sovereign immunity and the statute of limitations. (ECF No. 14). Defendants then filed a reply. (ECF No. 15). For the reasons stated below, the motion to dismiss the remaining claims will be granted.

## BACKGROUND

Adrienne Walker-Pittman is a fifty-year-old African-American woman residing in Baltimore County. (ECF No. 1, ¶ 3). Walker-Pittman first became employed by the Maryland Aviation Administration ("MAA") within MDOT in August 1990. (*Id.* at ¶ 6). From that time

1

until January 27, 1996, Walker-Pittman worked as the Assistant Director of Public Affairs and Community Relations for the Maryland Aviation Administration ("MAA"). *Id.* In this role, Walker-Pittman was the spokesperson for the Baltimore Washington International Airport. *Id.*

On January 27, 1996, Walker-Pittman was involved in an automobile accident and sustained serious injuries. (*Id.* at ¶ 7). Her left leg was amputated above the knee and she experienced severe head trauma. *Id.* She was in a coma for fifteen days and was diagnosed with a traumatic brain injury. *Id.* As a result of the accident, Walker-Pittman was physically fragile and had difficulty with her memory and attention, as well as her ability to process information and complete tasks. (*Id.* at ¶ 8).

Walker-Pittman was absent from work for over a year following the accident. (*Id.* at ¶ 7). She returned on or about February 3, 1997. *Id.* Initially, a job coach was employed to assist her with the return and transition her to a position "consistent with her new capabilities." (*Id.* at ¶ 9). This coach ceased performing services in April. *Id.* Walker-Pittman was not satisfied that he had "complete[d] an effective analysis for the employer of what available positions might be matched with . . . [her] capabilities to provide her the opportunity to perform productive work." *Id.*

Over the next twelve years, Walker-Pittman continued to serve as an employee of the MDOT. She was employed by the MAA from the time of her return until 1999, (*id.* at ¶ 10), when she was transferred to the customer service division of the MTA, another division within MDOT. (*Id.* at ¶ 11). She was assigned to the MTA offices in Baltimore, where she worked in the Office of Certification, screening applications for handicap mobility services. *Id.* During

this time, Walker-Pittman continued to have the same title[1] and receive the same pay as she did prior to her accident; however, her work responsibilities were significantly different. *Id.*

In 2007, Walker-Pittman was again reassigned, this time to a different MTA office in Baltimore. (*Id.* at ¶ 11). In her new position, Walker-Pittman "spent her time digitally scanning documents." *Id.* According to Walker-Pittman, during the entire period of her employment following her accident, "no effort was made [to] . . . place . . . [her] in a position that matched her experience with her physical and mental limitations and capabilities." *Id.*

On March 3, 2009, Walker-Pittman received a negative performance review for the first time. (*Id.* at ¶ 12–13). Her evaluation was completed by her then-supervisor, Richard Scolli. (*Id.* at ¶ 12). In it, Scolli specified that Walker-Pittman needed to complete an improvement plan for categories in which she fell "below" or "far below" the standard, which included "work habits" and "job quality." (*Id.* at ¶ 13). Walker-Pittman states that prior to this review, she had "quietly" expressed concerns about the "incongruity" between her job description and her work assignments. (*Id.* at ¶ 14). She made these objections more assertively after this review but did not receive a response. *Id.*

In September 2009, Walker-Pittman learned that her position would be abolished on October 1, 2009 due to budget cuts. (*Id.* at ¶ 15). At this time, Walker-Pittman was fifty years old. *Id.* She learned that other African-American women in her age group had also received news that their positions would be eliminated. *Id.* Walker-Pittman filled out an intake

---

[1] It is unclear from the complaint precisely what Walker-Pittman's title was. The complaint first states that she served as the Assistant Director of Public Affairs and Community Relations for the Maryland Aviation Administration during the period prior to her accident. (ECF No. 1 at ¶ 1). Later, the complaint states that after the accident, Walker-Pittman "continued to occupy the position of Public Information Officer that she had filled when she was the MAA spokesperson for BWI." (*Id.* at ¶ 11). This opinion assumes that Walker-Pittman had the same title both before and after the accident.

questionnaire with the Equal Employment Opportunity Commission ("EEOC") on January 5, 2010, (ECF No. 5-7) and filed a charge of discrimination on July 16, 2010. (ECF No. 5-8). She received a notification of right to sue on November 3, 2013. (ECF No. 1 at ¶ 16). On January 27, 2014, Walker-Pittman filed this suit. (ECF No. 1).

In her complaint, Walker-Pittman brings three counts against defendants, each of which contains several causes of action. Count one alleges race and gender discrimination in violation of Title VII, age discrimination in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621–634 ("ADEA"), and unlawful employment practices in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-606. (ECF No. 1 at ¶¶ 18–25). Count two includes claims for unreasonable failure to accommodate a disability in violation of Title I of the ADA and Section 504 of the Rehabilitation Act of 1973, 29 U.S. C. § 794, and unlawful employment practices in violation of the MFEPA. (ECF No. 1 at ¶¶ 26–32). Count three asserts claims for unlawful retaliation in violation of Title VII, the ADEA, the ADA, Section 504 of the Rehabilitation Act, and the MFEPA. (ECF No. 1 at ¶¶ 33–39).

After the complaint was filed, the defendants filed a motion to dismiss or, in the alternative, for summary judgment. Walker-Pittman then filed a response in opposition.[2] In this response, Walker-Pittman conceded that sovereign immunity bars her claims under the ADEA and Title 1 of the ADA (ECF No. 14 at 14) and that her claims under the Maryland Code and Section 504 of the Rehabilitation Act are untimely. (*Id.* at 19–20). Accordingly, these claims

---

[2] As noted, the defendants filed a motion to dismiss or, in the alternative, for summary judgment. In her opposition, Walker-Pittman attached a motion under Fed. R. Civ. P. 56(d), which is used "when a party lacks material facts necessary to combat a summary judgment motion." *McCray v. Maryland Dep't of Transp., Maryland Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014). Because I not converting the defendant's motion to dismiss into a motion for summary judgment, I need not rule on the Rule 56(d) motion.

will be dismissed. Walker-Pittman states her intention to raise a new claim alleging a violation of Title II of the ADA. (*Id.* at 14 n.4). This potential claim and her claims for gender discrimination, sex discrimination, and retaliation under Title VII will be considered below.

## STANDARD

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli,* 588 F.3d 186, 192 (4th Cir.2009).

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). The plaintiff's obligation thus is to set forth sufficiently the "grounds of his entitlement to relief," offering "more than labels and conclusions." *Id.* (internal quotation marks and alterations omitted). It is not sufficient that the well-pled facts create "the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Rather, to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning the court

5

could draw "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## ANALYSIS

1. **Title VII Claims**

Walker-Pittman alleges violations of Title VII on three grounds: race discrimination, gender discrimination, and retaliation. (ECF No. 1); (ECF No. 14). The claims that relate directly to the abolition of Walker-Pittman's position through the budget process are barred by legislative immunity. Fourth Circuit law makes clear, however, that claims relating to discrimination or retaliation that occurred prior to the elimination of her position are not subject to this legislative immunity bar. Nonetheless, they are still subject to the procedural requirements of Title VII.

In this case, Walker-Pittman did properly exhaust her claims through the administrative process that Title VII requires. However, the claims that are not barred by sovereign immunity were filed outside the statute of limitations and, as a consequence, are time barred. Further, even if these claims were not time barred, Walker-Pittman fails to state a claim upon which relief can be granted.

   A. *Legislative Immunity*

In a related case, the Fourth Circuit found that cuts at the MTA and MDOT resulting from a state budgetary reduction in the workforce were a "legislative act." *McCray v. Maryland Dep't of Transp., Maryland Transit Admin.*, 741 F.3d 480, 485 (4th Cir. 2014). The court also found that the MTA and MDOT, which gave executive officials advice regarding the positions to be abolished, were protected by legislative immunity. *Id.* Thus, any claims brought by Walker-

Pittman directly relating to the abolition of her position through the budgetary process are barred by legislative immunity.

In *McCray*, however, the Fourth Circuit held that if a plaintiff is "subject to discriminatory adverse employment actions that made her position vulnerable to the budget cuts that eventually came" and these actions were taken "before any legislative activity," they are not barred by legislative immunity. *Id.* at 486 (internal citations omitted). The court reasoned that because the basis of McCray's claim was not the "financial storm that rocked the state and forced Maryland's government to scale back its budget," *id.*, the suit "need not develop in a way that would pose a threat to legislators." *Id.* at 487. Instead, McCray's claim was that her state employers, in the period prior to her termination—or the lightning strike—"gave her a lightning rod to hold and sent her to the roof." *Id.* at 486. This claim was not barred by legislative immunity.

Based on this holding, a portion of Walker-Pittman's claims must be examined further. She alleges that for a period prior to her termination, she was transferred several times and her responsibilities were reduced. (ECF No. 1 at ¶¶ 10, 11, 14). In turn, this made her more vulnerable to termination when the budget cuts were made. (ECF No. 14 at 15–18). These allegations are akin to the claims in *McCray* that the Fourth Circuit found not barred by legislative immunity. *See McCray*, 741 F.3d at 485–87.

B. Exhaustion

Title VII requires that aggrieved parties file a charge with the EEOC prior to filing suit in federal court. 42 U.S.C. § 2000e-5(f)(1) (2006). This "exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles v. Dell, Inc.,* 429 F.3d 480, 491 (4th Cir. 2000). Additionally, when a

plaintiff has properly filed a charge with the EEOC, the scope of judicial review is limited by the charge itself.  *See Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 962–63 (4th Cir.1996) ("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint.").  Accordingly, only those discrimination claims "stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint" are permitted in a subsequent lawsuit.  *Jones v. Calvert Group,* 551 F.3d 297, 300 (4th Cir. 2009) (quoting *Evans*, 80 F.3d at 963).

The defendants argue that Walker-Pittman's remaining claims are barred by her failure to exhaust under Title VII, contending that Walker-Pittman has not identified "an adverse employment action that was the subject of a timely-filed administrative complaint and that occurred prior to the budget process that resulted in her job position being identified for abolishment."  (ECF No. 15 at 6).  Because the exhaustion requirement of Title VII serves as a jurisdictional bar; *see Balas*, 711 F.3d at 406 (citing *Jones*, 551 F.3d at 300), the defendants' motion to dismiss on exhaustion grounds will be adjudicated as a motion under Fed. R. Civ. P. 12(b)(1).  In ruling on a motion under Rule 12(b)(1), the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir. 1999) (internal citation omitted).  The relevant document here is Walker-Pittman's original EEOC charge, which was filed as an exhibit with defendants' motion to dismiss.  (ECF No. 5-8).

In her EEOC charge, Walker-Pittman identified that she was subject to discrimination based on five categories: race, sex, retaliation, age, and disability.  (ECF No.5-8 at 1).  The majority of the particulars she alleges relate to the abolition of her position due to the budget

cuts. *Id.* As noted above, these are barred by sovereign immunity. Walker-Pittman does, however, make reference to one instance in which her responsibilities changed prior to the cuts. She states "I was notified in December 2007 that I would be reassigned from the MTA Certification Office to the MTA Mobility Division effective January 2008 with no reason given." *Id.* She also states that in the period prior to her lay-off, "I was never told my work was unsatisfactory." *Id.*

In her complaint, Walker-Pittman reaches further back in her employment history, stating that in the decade following her accident, she was placed in "low performing positions" by managers who were "uninformed about the capabilities of a person suffering from her condition." (ECF No. 1 at ¶ 10). Her "responsibilities changed significantly" after the accident from "dealing with the media as she had done previously to just reviewing and clipping relevant news articles." *Id.*

Walker-Pittman makes the same allegations regarding her work duties following her transfer to the MTA in 1999. She claims that her "actual work responsibilities in this new position bore no relationship to her prior duties," and states again that "no effort was made . . . [to] place . . . [her] in a position that matched her experience with her physical and mental limitations and capabilities." (*Id.* at ¶ 11). In her new role, she "spent her time digitally scanning documents." *Id.*

Whether Walker-Pittman has satisfied the exhaustion requirement is a close call. In her EEOC charge, she did check all three of the boxes that remain at issue in the Title VII portion of this case—discrimination based on race, sex, and retaliation. (ECF No.5-8 at 1). Only briefly, however, does she mention the period prior to her lay-off. Her most direct statement is that she was transferred in December 2007 with "no reason given." (ECF No.5-8 at 1). It is arguable

9

whether the more detailed allegations in her complaint relating to her decreased job responsibilities are "reasonably related" to the sparse particulars in her EEOC charge. *Jones,* 551 F.3d at 300. Construed most favorably to Walker-Pittman, the allegation in her EEOC charge regarding her job transfer may suggest that actions prior to her termination made her vulnerable to the lay-off. Given that Walker-Pittman identified this transfer, and that she indicated the same types of discrimination in her EEOC charge and complaint, I will assume without deciding that she has satisfied the requirement for exhaustion.

    *C. Timeliness*

In addition to being properly exhausted, an EEOC charge must be filed within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). This period is extended to 300 days in a deferral state, such as Maryland, which has a local or state agency with authority to grant or seek relief. *Id.* "Timeliness requirements for an action alleging employment discrimination are to be strictly enforced." *Tangires v. Johns Hopkins Hosp.*, 79 F. Supp. 2d 587, 597 (D. Md. 2000) (citing *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984)). Accordingly, charges filed outside the time frame are barred. *See Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 962 (4th Cir.1996).

The statute of limitations is considered an affirmative defense, *see* Fed.R.Civ.P. 8(c), and courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F. 3d 458, 464 (4th Cir. 2007). This is only appropriate "if all facts necessary to the affirmative

defense 'clearly appear[ ] *on the face of the complaint.*" *Id.* (internal quotations and citations omitted) (emphasis in original). A court also may consider documents "attached or incorporated into the complaint," as well as documents attached to the defendant's motion, "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem' l Hosp.,* 572 F.3d 176, 180 (4th Cir.2009). In this case, the EEOC charge that Walker-Pittman filed, which was attached to defendants' motion to dismiss (ECF No. 5-8), is integral and authentic, and may be considered.

Walker-Pittman's transfers and the reduction of her job duties occurred more than 300 days prior to her filing an EEOC charge. (ECF No. 5 at 12–15); (ECF No. 15 at 2–8). She attempts to overcome this bar by relying on the continuing violation doctrine announced by the Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

*Morgan*, however, held that when a plaintiff brings a claim involving a discrete discriminatory or retaliatory act, she must file her charge within 180 or 300 days of that act. *Id.* at 113. Therefore, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* Furthermore, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* In *Morgan*, the court provided examples of what constitutes a "discrete act," including "termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114.

The court in *Morgan* distinguished discrete acts from "hostile environment claims." *Id.* at 115. These claims, by "[t]heir very nature involve[] repeated conduct," *id.,* because a "hostile work environment is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (citing 42 U.S.C. § 2000e–5(e)(1)). Because the conduct is repeated, it "cannot be said to occur on any particular day" and, unlike discrete acts "a

single act of harassment may not be actionable on its own." *Id.* at 115. Given these characteristics, the court held that an employer may be found liable for "all acts that are part of . . . [a] single claim" of hostile work environment, even those that occurred outside the limitations period. *Id.* at 118.

In her opposition, Walker-Pittman argues that the holding in *McCray*—permitting claims that make a plaintiff vulnerable to a budget cut lay-off when the lay-off itself is barred by legislative immunity—requires that the continuing violation theory in *Morgan* also be applied to her claims. (ECF No. 15 at 14-18). Using the "lightning rod" analogy from *McCray*, Walker-Pittman argues that it would be "nonsensical to expect an employee unaware of any risk in going up to the roof to complain about anything" when initially sent there. *Id.* at 16. Essentially, a plaintiff should not be expected to file an EEOC charge when they are transferred or their responsibilities are reduced, because, at that time, they are unaware these actions will eventually make them vulnerable to a lay-off. *Id.*

However, the court's ruling in *Morgan* is clear: a discrete employment action includes "termination, failure to promote, denial of transfer, or refusal to hire." *Morgan*, 536 U.S. at 114. Walker-Pittman argues that she was transferred and her responsibilities were reduced during the period prior to her termination, which in turn made her more vulnerable to a lay-off. (ECF No. 1, ¶¶ 10, 11). As noted above, the only mention of these allegations Walker-Pittman makes in her EEOC charge relate to one transfer that occurred in late December 2007 and was effective January 2008. (ECF No. 5-8). This incident, and the others specified in her complaint, are discrete employment actions. They occurred on specific, identifiable days. Walker-Pittman does not allege that her claims involve "repeated conduct" that "cannot be said to occur on any

12

particular day" which together constituted a hostile work environment. *Morgan*, 536 U.S. at 115. Accordingly, her claims should be treated as discrete employment actions.

Walker-Pittman was laid off on September 30, 2009, and filed her EEOC charge on July 16, 2010. Her charge was filed within 300 days of her termination; but the claim relating to her termination is barred by sovereign immunity. In contrast, any claims relating to prior transfers or reductions of responsibility were filed outside the 300 day limitations period and thus are time-barred. *See* 42 U.S .C. § 2000e–5(e)(1). Although the claims are subject to dismissal on this basis alone, Walker-Pittman also has failed to state a claim under Fed. R. Civ. P. 12(b)(6) as explained below.

D.  Failure to State a Claim

    a.  Discrimination

The timely filing requirement of Title VII, unlike the exhaustion requirement, is an affirmative defense, rather than a jurisdictional bar. *See* Fed.R.Civ.P. 8(c). It is thus subject to equitable doctrines such as tolling and estoppel. *Morgan*, 536 U.S. at 113 (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 392 (1982)). Although Walker-Pittman has not argued explicitly that tolling is appropriate, she implicitly suggests this in her opposition. (ECF No. 14 at 15–18).

Courts strictly adhere to the time limits provided by statutes and rarely allow the application of equitable tolling or estoppel. *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95–96 (1990). Equitable relief such as this is only extended "sparingly," in narrow circumstances. *Id.* at 96. For example, "[e]quitable tolling applies where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action . . . . [e]quitable estoppel applies where the defendant engages in intentional misconduct to cause

13

a plaintiff to miss a filing deadline." *English v. Pabst Brewing Co.,* 828 F.2d 1047, 1049 (4th Cir. 1987).

There is no evidence that the defendants have engaged in behavior that would warrant tolling the statute of limitations or applying equitable estoppel. In any event, Walker-Pittman has failed to state a claim upon which relief could be granted.

To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) similarly situated employees outside of her protected class(es) received more favorable treatment. *See White v. BFI Waste Services, LLC,* 375 F.3d 288, 295 (4th Cir.2004) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)).

As to the first prong, Walker-Pittman is an African-American woman and therefore a member of two protected classes. Regarding the second prong, the only adverse employment action that Walker-Pittman could be suing for is her transfer in January 2008 and alleged reduction of responsibilities in the period prior to her termination.

Walker-Pittman has not explicitly alleged in her complaint the last two prongs of the test with respect to her pre-termination claims—that she was performing her duties at a level that met her employer's legitimate expectations and that similarly situated employees outside of her class received more favorable treatment. *McDonnell,* 411 U.S. at 802. Walker-Pittman does state that she was not given a negative performance review until March 2009, her first negative review since her return to work following her accident in 1997. (ECF No. 1, ¶¶ 12, 13). But, the lack of a negative performance review for a certain period does not indicate that she was performing to

the appropriate level of expectation.  In fact, Walker-Pittman's multiple transfers during this period suggest that her employer may have been trying to find a position in which she could perform appropriately, but was unsuccessful.

Further, Walker-Pittman has not established the fourth prong of the test.  She only notes that at the time of her lay-off, other women of her race also had their positions terminated.  All actions relating to this termination are barred.  She has not indicated that the other adverse employment actions she complained of did not affect people outside of her class.  Ultimately, Walker-Pittman has not proffered any evidence to show that she was transferred or her duties reduced because of her race and/or gender, rather than some other non-discriminatory factor.

      *b.  Title VII Retaliation*

Walker-Pittman also asserts a claim based on retaliation under Title VII.  In order to establish a *prima facie* case, she must show that: 1) she engaged in protected activity; 2) the employer took an adverse employment action against her; and 3) a causal connection existed between the activity and the adverse action.  *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F. 3d 239, 242 (4th Cir. 1997) (citing *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985)).

Walker-Pittman fails on the first prong of the test, because she has not alleged that she engaged in a protected activity.  Protected activity under Title VII is divided into two categories: participation and opposition.  *Laughlin v. Metro. Washington Airports Authority,* 149 F.3d 253, 259 (4th Cir.1998).  To proceed with a participation claim, an individual must be retaliated against for "(1) making a charge; (2) testifying; (3) assisting; or, (4) participating in any manner in an investigation, proceeding, or hearing under Title VII."  *Id.*  (citing 42 U.S.C. A. § 2000e-3(a)).  In contrast, oppositional activity is composed of "utilizing informal grievance procedures

as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id.* To evaluate claims involving oppositional activity, the court utilizes a balancing test, weighing "the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Id.* (internal citations and quotations omitted).

In her complaint, Walker-Pittman does not identify any protected activity she participated in. She suggests that she was retaliated against for filing her EEOC charge (ECF No. 1, ¶ 29) but she filed her charge after her transfers and termination. She also claims that she was retaliated against for the "assertion of her federal and state interests." (Id. at ¶¶ 34–37). She does not provide any details to suggest how or when she asserted these rights. It is also not clear what rights she was asserting, as she only alleges that she complained about the "incongruity of her work assignments and her existing job description," which is not an assertion of discriminatory treatment. (*Id.* at ¶ 14). These bare bones claims do not show any participatory or protected activity, and accordingly, she fails to state a claim.

## II. ADA Claim

In her complaint, Walker-Pittman brought a claim under Section I of the ADA, as amended, 42 U.S.C. §§ 12101–12113. The defendants argued, and Walker-Pittman conceded, that this claim is barred by sovereign immunity. *See MCray*, 741 F.3d at 483 ("Sovereign immunity has not been abrogated for . . . ADA Title I claims.").

Walker-Pittman also asserted in her opposition that she would seek leave to amend her complaint to bring a claim under Title II of the ADA. (ECF No. 14 n.4). She has not yet done so. Any such amendment, however, would be futile.

Even assuming *arguendo* that a Title II claim is viable against a state agency, Walker-Pittman's claim would be barred by the statute of limitations. Title II of the ADA does not contain its own specific statute of limitations*, see Society Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011), and the catch-all federal statute of limitations, codified at 28 U.S.C. § 1658, does not apply to Title II. *See id.* at 347. Therefore, the claim is subject to the "state statute of limitations that applies to the most analogous state-law claim." *Id.* at 347 (citing 42 U.S.C. § 1988).

Defendants argue that the most applicable state statute of limitations is the two-year period in the MFEPA, Md. Code Ann., State Gov't § 20-1013. (ECF No. 15 at 13). Walker-Pittman relies on an unpublished Fourth Circuit opinion holding that: "Maryland courts apply the three-year limitations period governing general civil actions to ADA and Rehabilitation Act claims." *Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 226 (4th Cir. 2013)

Applying either limitations period, Walker-Pittman's claims are time barred because her termination was in October 2009 and she did not file suit until January 2014.

## CONCLUSION

For the aforementioned reasons, defendants' motion to dismiss will be granted. A separate order follows.

|     01/29/2015     | /s/ |
|---|---|
| Date | Catherine Blake |
|  | United States District Judge |